**Dan and Louise HOXWORTH, et al., Plaintiffs,**

**v.**

**Lillian BLINDER, et al., Defendants.**

**No. 93–C–1260.**

United States District Court, D. Colorado.

July 29, 1994.

John Richilano, Denver, CO, for plaintiffs.

Steve A. Miller, Denver, CO, for defendants.

## MEMORANDUM OPINION AND ORDER

CARRIGAN, District Judge.

Plaintiffs Dan and Louise Hoxworth, individually and on behalf of the Hoxworth class, commenced this action against the defendants Meyer and Lillian Blinder (collectively the Blinders), the Lillian Blinder Trust, Donald Walford and Walford, Demaret & Co. (collectively the Walfords), and Bradford L. Bolton, the Clerk of the United States Bankruptcy Court for the District of Colorado, seeking a declaration as to their rights to certain assets now being held in the registry of the United States Bankruptcy Court for the District of Colorado. Lillian Blinder filed a cross-claim against the plaintiffs, as

well as a claim against the Walfords, seeking a declaration of her rights in the disputed assets.

The issues have been briefed extensively and oral argument was heard on July 15, 1994. Jurisdiction exists pursuant to 28 U.S.C. §§ 1331, 1332, 1963, 1346, 2041, and 2042.

## I. FACTUAL BACKGROUND.

In January 1988, the plaintiffs commenced three actions in the United States District Court for the Eastern District of Pennsylvania, all of which alleged fraud in marketing certain securities. Named as defendants in those suits were Blinder, Robinson & Co., Inc. (Blinder Robinson) and Meyer Blinder, its president and control person. In early 1989, Intercontinental Enterprises, Inc. (IEI), Blinder Robinson's parent corporation, was added as a defendant.

On August 1, 1990, proceedings for liquidation of Blinder Robinson were commenced in the United States Bankruptcy Court for the District of Colorado. As a result, all proceedings in the Eastern District of Pennsylvania were stayed with respect to Blinder Robinson. Plaintiffs' actions in Pennsylvania continued against Meyer Blinder and IEI. In addition the plaintiffs filed in the bankruptcy court for Colorado a proof of claim against Blinder Robinson in the amount of $50 million.

In March 1991, the trustee for liquidation of Blinder Robinson commenced an action in the bankruptcy court against the Blinders, seeking a declaration that Blinder Robinson and the Blinders were alter egos, and that all of the Blinders' individual and joint assets were properly the property of the Blinder Robinson bankruptcy estate.[1]

On January 10, 1992, in response to continued discovery abuses, the bankruptcy court entered default judgment against the Blinders, declaring that Blinder Robinson was their alter ego and ordering the Blinders to transfer to the trustee "all of their individual and joint property whether directly or indirectly owned and wherever located and by whoever held, including any property held in trust for the benefit of either Meyer or Lillian Blinder." (Record at 120). On February 4, 1992, the assets were transferred into the bankruptcy court registry to be held in *custodia legis* in lieu of a supersedeas bond.

On February 7, 1992, the plaintiffs obtained a judgment in the United States District Court for the Eastern District of Pennsylvania against Meyer Blinder and John Cox in the amount of $73,319,824.45, and against IEI in the amount of $70,111,812.55.[2] The district court in Pennsylvania imposed a constructive trust and an equitable lien on all assets in which Meyer Blinder had an interest, as well as a constructive trust and an equitable lien on all assets traceable to the $23 million that was defrauded from the plaintiffs, irrespective of who held those assets. The judgment was affirmed by the Third Circuit, and has been registered in this District at Docket No. 92-RJ-87.

On March 12, 1992, before the plaintiffs had an opportunity to execute their judgment, the bankruptcy court issued a final order declaring that all the Blinders' property, and all the assets in the Lillian Blinder Trust, were the property of the Blinder Robinson estate, and all were being held in *custodia legis* by the bankruptcy court.[3] (Record at 122–27). On March 17, 1992, however, the

1. At about the same time, the trustee commenced an adversary action against the plaintiffs, seeking to enjoin the plaintiffs from proceeding with their claims against Meyer Blinder and IEI. This action was premised on the theory that the automatic stay provisions of 11 U.S.C. § 362(a) should extend to Meyer Blinder and IEI as alter egos of Blinder Robinson. The bankruptcy court denied the trustee's request to enjoin the plaintiffs.

2. The total judgments were derived by tripling the actual damage award as provided by 18 U.S.C. § 1964 and adding costs and attorneys'

fees. The judgment against IEI was less than that against Meyer Blinder and John Cox because IEI came into existence eight months after the start of the class period.

3. The Blinders' liability as alter egos of Blinder Robinson was established by the bankruptcy court in its order dated January 10, 1992. The March 12, 1992 order came after a six day trial in which damages were determined with respect to the Blinders, and liability and damages were determined with respect to IEI.

United States District Court for the Eastern District of Pennsylvania enjoined Meyer Blinder and IEI from "selling, transferring or otherwise disposing of any of their assets, other than in the ordinary course of business, notwithstanding the March 12, 1992 Order of the United States Bankruptcy Court for the District of Colorado." [4] (Record at 119).

On August 12, 1992, the trustee reached a settlement agreement with the Blinders in the alter ego action that was then on appeal (the Blinder settlement). Pursuant to the agreement, the Blinders were to transfer all of their assets to the Blinder Robinson estate, with the exception of assets then valued at approximately $1.8 million which were to be held by the Lillian Blinder Trust. These assets are known as the "excluded assets." The settlement agreement was approved by the bankruptcy court over the plaintiffs' objections and the plaintiffs appealed. The Blinder settlement, however, could not be consummated because of the Pennsylvania district court's injunction.

On September 21, 1992, the plaintiffs and the trustee settled all outstanding claims against the estate, and the plaintiffs agreed to dismiss their appeal of the Blinder settlement. Plaintiffs were permitted to assert in the bankruptcy action a $30 million proof of claim. In exchange, the plaintiffs agreed to modify the Pennsylvania district court's injunction so the trustee could effectuate his settlement with the Blinders. Plaintiffs' settlement was approved by the bankruptcy court on October 26, 1992.

In March 1988, the Walfords obtained a multi-million dollar judgment against Blinder Robinson for malicious prosecution. Thus, they too are creditors of the Blinder Robinson estate. On November 5, 1990, the Walfords settled with the bankruptcy trustee, but they did not release their claims against Meyer Blinder, IEI, or the officers and directors of Blinder Robinson and IEI. On October 26, 1992, the Walfords filed an action in the Arapahoe County, Colorado, District Court, claiming an interest in the excluded assets on the ground that Meyer and Lillian Blinder and the Lillian Blinder Trust are the alter egos of Blinder Robinson. The Walfords' motion for summary judgment currently is pending before the Arapahoe County District Court.

## II. ANALYSIS.

The plaintiffs assert that they are entitled to the $1.8 million excluded assets as judgment creditors of Meyer Blinder. They argue that the excluded assets are traceable to the defrauded funds and therefore are subject to their equitable lien.

The Blinders respond that the plaintiffs' claim is barred by res judicata.[5] They further contend that the plaintiffs' equitable lien in the excluded assets was cut off on March 12, 1992, when the bankruptcy court declared that the Blinders and Blinder Robinson were alter egos and all of Meyer Blinder's assets belonged to the Blinder Robinson estate. Lastly, the Blinders respond that the plaintiffs waived all interest in the excluded assets when they dropped their appeal of the Blinder settlement and agreed to modify the district court injunction.

### A. Res Judicata.

The Blinders argue that the plaintiffs' claim should be dismissed because it is barred by the doctrine of res judicata. Specifically, the Blinders contend that when the plaintiffs dropped their appeal of the Blinder settlement agreement, pursuant to their settlement with the trustee, they forever released any claims that they may have had against the Blinder Robinson estate or the trustee's distributions of estate property to the Blinders. Plaintiffs concede that they released their claims against the estate, but argue that they never settled their claims against Meyer Blinder stemming from their judgment against him.

"Under res judicata, or claim preclusion, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could

---

4. The March 12, 1992 order was a clarification of a previous order, issued on February 28, 1992, enjoining the transfer of assets except in the ordinary course of business.

5. Meyer and Lillian Blinder are represented by separate counsel, each of whom filed a brief. Their arguments are similar, however, and they will be addressed together.

have been raised in the prior action." *Northern Natural Gas Co. v. Grounds,* 931 F.2d 678, 681 (10th Cir.1991). Within the bankruptcy context, an equitable lien against a bankruptcy estate is barred by res judicata if the lien holders fail to assert their liens upon notice of settlement between the trustee and various creditors of the bankruptcy estate. *In re Medomak Canning,* 922 F.2d 895 (1st Cir.1990).

The Blinders' reliance on *Medomak* presupposes that the plaintiffs are creditors of the Blinder Robinson estate who are asserting an interest in assets that were distributed to Lillian Blinder as a creditor of the estate. Lillian Blinder admits, however, that the excluded assets were given to her, not as a creditor, but "in consideration of the Blinders' abandonment of the appeal, which allowed the Trustee to keep the bulk of the Blinder assets, valued at some $12–17 million." (Lillian Blinder's Trial Brief at 7). Furthermore, the plaintiffs' asserted interest in the excluded assets is not based on their status as creditors of the Blinder Robinson estate, but rather on their status as judgment creditors of Meyer Blinder. Lastly, in *Medomak,* the equitable lien was against the bankruptcy debtor (in this case, Blinder Robinson), rather than against a party whose assets could be traced into the bankruptcy estate (in this case, Meyer Blinder). Accordingly, I find and conclude that *Medomak* is distinguishable and that the plaintiffs' claim is not barred by res judicata.

### B. *Equitable Lien.*

Plaintiffs argue that they have an equitable lien in the excluded assets because they are traceable to Meyer Blinder's assets or to the funds defrauded from the plaintiffs. The Blinders respond that any equitable liens that the plaintiffs might have had were extinguished when the bankruptcy court declared that the Blinders' property belonged to the

Blinder Robinson estate. Alternatively, the Blinders argue that the plaintiffs' equitable liens were surrendered when they settled with the trustee, or that the plaintiffs failed to preserve them when they dropped their appeal of the Blinder settlement.

Once imposed, an equitable lien relates back to the date the wrongful act occurred. *In re Seneca Oil Co.,* 906 F.2d 1445, 1453 (10th Cir.1990).[6] Funds subject to an equitable lien do not become part of the bankruptcy estate. *In re Mahan & Rowsey, Inc.,* 817 F.2d 682, 684 (10th Cir.1987). Thus, the holder of an equitable lien does not have to trace the funds after the date of bankruptcy. *Seneca Oil,* 906 F.2d at 1453.

Plaintiffs' judgment against Meyer Blinder includes "an equitable lien on all funds, assets or property in which Meyer Blinder ... has an interest," as well as "an equitable lien on all funds, assets or property, by whomever held, any portion of which can be traced to the $23,570,447.46 defrauded from the Plaintiff Class." These equitable liens relate back to the date of the original fraud—that is, September 1, 1984, the commencement of the class period. Thus, when the Blinders transferred their assets into the registry of the bankruptcy court, on February 4, 1992, they did so with the plaintiffs' equitable liens attached.

The Blinders first argue that the plaintiffs' equitable liens were extinguished when the bankruptcy court declared that the Blinders' property belonged to the Blinder Robinson estate. However, 11 U.S.C. § 541(d) provides:

> Property in which the debtor holds, as of commencement of the case, only legal title and not an equitable interest, ... becomes property of the estate ... only to the extent of the debtor's legal title to such property, but not to the extent of any

---

6. *In re Seneca Oil Co.* involved a constructive trust rather than an equitable lien. The primary distinction between an equitable lien and a constructive trust is that "the beneficiary of a constructive trust receives title to the trust property, [whereas] a plaintiff who receives an equitable lien obtains merely a security interest in the property held by the defendant." *In Re Marriage* *of Allen,* 724 P.2d 651, 658 (Colo.1986). The two operate similarly, however, in terms of "affording a preference over other creditors and in utilizing the rules for following property into its product." *Leyden v. Citicorp Indus. Bank,* 782 P.2d 6, 10 n. 8 (Colo.1989) (quoting Dan B. Dobbs, *Remedies* § 4.3, at 249 (1973)).

equitable interest in such property that the debtor does not hold.

Thus, even if the Blinders transferred legal title in their assets to the bankruptcy estate, the plaintiffs' equitable interest in the assets was not extinguished by the bankruptcy court's order. *See also Mahan & Rowsey,* 817 F.2d at 684 (holding that property subject to a constructive trust never becomes part of a bankruptcy estate).

■ Second, the Blinders contend that the plaintiffs waived their equitable liens by failing to preserve them when they settled with the trustee and received a $30 million proof of claim. They rely on *De Laney v. City and County of Denver,* 185 F.2d 246 (10th Cir.1950), where the court held:

A lien claimant may pursue one of three courses: (1) he may prove his claim as an unsecured claim and surrender his security; (2) he may prove his claim as a secured claim, give credit thereon for the value of the security, and share in the general assets as to the unsecured balances; or (3) he may not file a claim at all and rely solely upon his lien.

*Id.* at 251. Where a lien holder chooses option one or two, he must file and prove his claim in the bankruptcy court. *Id.* If he elects to rely solely upon his lien, his lien is preserved even without the filing of a formal claim in the bankruptcy court. *Id.*

■ The Blinders argue that the plaintiffs chose the first option by asserting a $30 million proof of claim against the estate and surrendering their security—namely, their equitable liens. This argument might be persuasive if the plaintiffs were asserting their liens against funds in the bankruptcy estate. Plaintiffs concede, however, that they have settled their claims against the estate. Accordingly, they are not pursuing assets of the estate; rather, they seek to enforce their equitable liens against assets *outside* the bankruptcy estate. Plaintiffs' settlement with the trustee did not cause their equitable liens to evaporate, it only precluded them from asserting their liens against the estate.

Finally, the Blinders reassert their argument that lien holders who fail to preserve their liens upon notice of settlement between the trustee and creditors of the bankruptcy estate are barred from later asserting the liens. This argument, however, is based on *Medomak,* 922 F.2d 895, a case that this court already has found distinguishable.

Accordingly, I find and conclude that the plaintiffs' equitable liens attached to the Blinders' assets on September 1, 1984 and were still attached when the trustee settled with the Blinders and allowed them to keep the excluded assets, then valued at approximately $1.8 million.

Plaintiffs contend that their equitable liens attach to all of the excluded assets because all can be traced to the defrauded funds. Specifically, they argue that Lillian Blinder never worked outside the home, and in light of the alter ego adjudication, all the excluded assets derived from Meyer Blinder's fraudulent activities and therefore are subject to the equitable lien. The Blinders respond that assets acquired before the class period commenced on September 1, 1984, cannot be traced to the defrauded funds. They further state that the plaintiffs' equitable lien in assets "in which Meyer Blinder has an interest" cannot attach to Lillian Blinder's interest in those assets.

■ I find and conclude that the plaintiffs' tracing theory is correct with respect to assets acquired after commencement of the class period. *See* Restatement of Restitution § 211(1) ("Where a person wrongfully mingles money of another with money of his own and subsequently makes withdrawals from the mingled fund, the other is entitled to an equitable lien upon the part which remains and the part which is withdrawn or upon their product."). I agree with the Blinders, however, that assets acquired prior to commencement of the class period cannot be traced to the funds acquired by fraud. Accordingly, the plaintiffs' equitable lien in assets traceable to the defrauded funds cannot attach to assets acquired prior to September 1, 1984.

■ Plaintiffs have an equitable lien in assets "in which Meyer Blinder has an

interest." This lien also relates back to September 1, 1984. Thus, the plaintiffs have an equitable lien in any assets held by Meyer Blinder, or a one-half interest in assets held by Meyer and Lillian Blinder as joint tenants, after September 1, 1984, even if those assets were acquired prior to that date.[7]

## C. *The Walford Defendants.*

The Walfords assert an interest in the excluded assets based on their status as judgment creditors of Blinder Robinson and general creditors of the Blinder Robinson estate. They argue that the Blinders are collaterally estopped from relitigating the bankruptcy court's holding that they are alter egos of Blinder Robinson. Because Lillian Blinder is an alter ego of Blinder Robinson, the Walfords argue that they should be allowed to enforce their judgment against Blinder Robinson by executing on the excluded assets that she now holds.

The Walfords' obtained their judgment against Blinder Robinson in March 1988, that is subsequent to the date that the plaintiffs' equitable liens attached. The Walfords have not provided any authority to support their position that their judgment against Blinder Robinson somehow extinguished the plaintiffs' equitable liens.[8] Accordingly, the Walfords cannot satisfy their judgment by executing on the assets in which the plaintiffs have a prior equitable lien.

With respect to any assets not subject to the plaintiffs' equitable lien, the Walfords have commenced an action in the District Court for Arapahoe County, Colorado, against the Blinders and the Lillian Blinder Trust. There they argue that they are entitled to satisfy their judgment from the Blinders' assets because the Blinders are alter egos of Blinder Robinson. This state court action involves the same parties, and the same issues, as presented here. A hearing already has been held in that case, and the Walfords' motion for summary judgment currently is pending before the court. Accordingly, this court will abstain from deciding that dispute. *See Brillhart v. Excess Ins. Co. of Am.*, 316 U.S. 491, 495, 62 S.Ct. 1173, 1175–76, 86 L.Ed. 1620 (1942); *Kunkel v. Continental Cas. Co.*, 866 F.2d 1269, 1276 (10th Cir.1989).

Accordingly, IT IS ORDERED that

(1) Plaintiffs have an equitable lien in those excluded assets that originally were acquired by the Blinders or the Lillian Blinder Trust subsequent to September 1, 1984, because they are traceable to funds, assets, or property defrauded from the plaintiffs;

(2) Plaintiffs have an equitable lien in those excluded assets in which Meyer Blinder had an interest subsequent to September 1, 1984, even if originally acquired prior to that date;

(3) The excluded assets in which the plaintiffs have an equitable lien will be held as security for return of the $23 million defrauded from the plaintiffs;

(4) Plaintiffs' rights to the excluded assets in which they have an equitable lien are superior to the defendants' rights in those assets.

---

7. Apparently, Meyer Blinder transferred his interest in various assets to Lillian Blinder or the Lillian Blinder Trust sometime in 1990. These transfers did not extinguish the plaintiffs' equitable lien in those assets because neither Lillian nor the Trust were bona fide purchasers for value. *See* Restatement Restitution § 172; *In re Marriage of Allen*, 724 P.2d 651, 658 (Colo.1986).

8. Indeed, it is not even clear that the Walfords take this position.