**In re BLINDER, ROBINSON & CO., INC.**

**Glen E. KELLER, Jr., Trustee for the liquidation of the business of Blinder, Robinson & Co., Inc., Plaintiff–Appellee,**

v.

**HOYLE, MORRIS & KERR, Defendant–Appellant.**

Civil Action No. 94–K–2892.
Bankruptcy No. 90–1170 SEE (SIPA).
Adversary No. 94–1067 DEC.

United States District Court,
D. Colorado.

Aug. 22, 1996.

---

William A. Bianco, Tom McNamara, Davis, Graham & Stubbs, LLC, Denver, CO, for Plaintiff–Appellee.

Mark A. Wielga, Claire E. Holmes, Ballard, Spahr, Andrews & Ingersoll, Denver, CO, Stephen J. Mathes, Mark F. Bernstein, Hoyle, Morris & Kerr, Philadelphia, PA, for Defendant–Appellant.

## MEMORANDUM DECISION ON APPEAL

KANE, Senior District Judge.

The Philadelphia-based law firm of Hoyle Morris & Kerr (HM & K) appeals from the bankruptcy court's December 6, 1994 order entering judgment in favor of Glen E. Keller, Jr., trustee for the estate of Blinder, Robinson & Co. ("Trustee"), on his claims against HM & K for the turnover, pursuant to 11 U.S.C. §§ 542 and 549, of $75,000 in legal fees transferred from the Lillian Blinder Trust to HM & K. HM & K contends the order should be reversed because: (1) the Trustee failed to prove the $75,000 was property of the estate; (2) the bankruptcy court erred when it found HM & K an "initial transferee" within the meaning of 11 U.S.C. § 550(a) instead of a subsequent good faith transferee under § 550(b)(1); (3) the court erroneously rejected HM & K's argument that a settlement in the related children's trust action constituted an accord and satisfaction of the Trustee's claims against HM & K here; and (4) the court erroneously rejected HM & K's defense that the Trustee's claims were barred or otherwise equitably estopped under the doctrine of laches.

Appellate jurisdiction exists under 28 U.S.C. § 158(a). After examining the record and the briefs of the parties, I find oral argument would not materially assist in the determination of the appeal. I find HM & K's arguments unpersuasive and affirm.

## I. FACTS AND PROCEDURAL HISTORY.

This is another in a series of adversary proceedings arising out of the Blinder Robinson bankruptcy. Blinder Robinson was a multi-million Colorado-based securities firm run by Meyer Blinder and his wife Lillian. The company's fortune began to turn in 1988 when a class of investors initiated securities fraud proceedings in Pennsylvania against the firm and Meyer Blinder. Blinder Robinson's parent company, Intercontinental Enterprises, Inc. (IEI), was added as a defendant in 1989. *See Hoxworth v. Blinder, et al.,* 170 B.R. 438, 440 (D.Colo.1994), *aff'd* 74 F.3d 205 (10th Cir.1996).

By August 1990, liquidation proceedings had commenced in the United States Bankruptcy Court for the District of Colorado under the Securities Investor Protection Act of 1970, 15 U.S.C. §§ 78aaa *et seq.* (SIPA). As a result, the Hoxworth litigation was stayed with respect to Blinder Robinson, but continued in Pennsylvania against Meyer Blinder and IEI.

On January 11, 1991, Lillian Blinder, as trustee for the Lillian Blinder Trust, established Account No. 300–6327–9 in her own name at the State Street Bank and Trust Company in Boston (the "State Street" or "Boston" account).

In April 1991, the Trustee initiated an adversary proceeding against IEI, the Blinders and related parties, seeking a declaration that Blinder Robinson and the Blinders were alter egos and that all of the Blinders' individual and joint assets were properly the property of the Blinder Robinson bankruptcy estate. *Keller v. Blinder, et al.,* 91–1283 RJB (Bank.D.Colo.) (the "Alter Ego Action"). The Lillian Blinder Trust was not specifically named a defendant in the Alter Ego Action.

On December 30, 1991 the bankruptcy court issued an order in the Alter Ego Action granting summary judgment in favor of the Trustee on its claims against Meyer Blinder in an amount exceeding $10 million. In response to continued discovery abuses, the bankruptcy court also entered default judgment against the Blinders on all of the Trustee's claims. To protect the Trustee, the bankruptcy court on January 2, 1992 issued the following temporary restraining order:

> Meyer and Lillian Blinder, and all of their agents, servants and employees, are hereby enjoined ... from transferring, conveying, hypothecating, encumbering or otherwise disposing of any real or personal property, in their possession, custody or control, including all property in the Lillian Blinder Trust, valued at or above one thousand dollars ($1,000), other than in satisfaction of bills and obligations incurred in the ordinary course of their businesses.

(R.Vol. II, Ex. 4.)

The bankruptcy court entered its judgment against the Blinders in the Alter Ego Action on January 10, 1992. The court declared Blinder Robinson to be the Blinders' alter ego and ordered the couple to transfer to the Trustee "all of their individual and joint property, whether directly or indirectly owned and wherever located and by whoever (sic) held, *including any property held in trust for the benefit of either Meyer or Lillian Blinder.*" Judgment (R.Vol. II, Ex. 5) (emphasis added).

Also on January 10, 1992, the Trustee, Meyer Blinder and Lillian Blinder entered into a stipulation on the record for a stay pending appeal of the summary judgment against Meyer Blinder and the judgment against both Blinders. Tr. of 1/10/92 Hearing (R.Vol. II, Ex. 7) at 5–7; *see* Minutes of Proceedings, 1/10/92 (*id.,* Ex. 6). The stipulation provided that the Trustee would not execute on the alter ego judgment and the Blinders would be permanently enjoined "from transferring any assets in which they have a legal or equitable interest, including assets held in the Lillian Blinder Trust." Tr. at 5. The stipulation specifically stated that the injunction would be "substantially in the same form" as the January 2 TRO, except that the Blinders would be required to report to the Trustee "any transfers of funds or other assets in the amount or value exceeding ... $2,000." *Id.* at 6. The bankruptcy judge approved the stipulation and made it an order of the court "effective as of [January 10, 1992]," but asked the parties to file the stipulation in writing along with a form of order for his signature. *Id.* at 10–11.

The parties prepared and filed their written Stipulation of Parties Regarding Deposit of Assets, Etc. into Court Registry for Purpose of Obtaining Stay of Execution and form of order on February 4, 1992. (R.Vol. II, Ex. 8.) The order prohibited the Blinders from "transferring or removing from their present location any and all of their fixed assets ... without prior order of the Court, upon notice (not less than three days) and application to the Trustee," for the "duration of the Stay." *Id.* The bankruptcy court signed the order the same day, but only after adding to the list of "fixed assets" subject to its injunction "all property of Lillian Blinder in which she has a legal or equitable interest including without limitation property held by the Lillian Blinder Trust, and the like, without prior order of this Court." *Id.* (Judge Brumbaugh's handwritten interlineation).

The Blinders' assets, including those in the Lillian Blinder Trust, were deposited into the bankruptcy court registry on February 4, 1992 to be held *in custodia legis* in lieu of a supersedeas bond. In an action typifying the Blinders' conduct during this period,[1] however, Lillian Blinder had managed to transfer $75,000 to HM & K the day before.

On February 3, 1992, notwithstanding the January 2 TRO, the January 10 judgment or the January 10 stipulation and bench ruling approving it, Lillian Blinder transferred assets out of the Lillian Blinder Trust without notifying the Trustee or seeking approval from the bankruptcy court. Meyer Blinder and HM & K partner Stephen J. Mathes had arranged for the transfer in a telephone conversation the day before. *See* Trial Tr. (R.Vol. V) at 27–37.

At trial, Mathes testified Blinder phoned him on February 2, 1992 to ask HM & K to represent him in the Hoxworth class action and to appear on his behalf at a hearing set for the following day. Trial Tr. (R.Vol. V) at 27. Mathes knew Blinder because he had represented him in the Hoxworth litigation while with another law firm, Dilworth, Paxson, Kalish & Kauffman.[2] *Id.* at 21–24.

The telephone call lasted nearly three hours. Mathes, knowing Blinder to be a "difficult client" and aware of Blinder's propensity for failing to pay attorney fees,[3] refused to represent Blinder without a retainer. Trial Tr. (R.Vol. V) at p. 34–36. Mathes admitted at trial that Blinder told him he had "no assets at all to pay any fee" because the Colorado bankruptcy court had "tied up all [his] assets." *Id.* at p. 34. Blinder told Mathes his wife, however, "had money in some kind of trust in Boston." Mathes testified that the parties agreed Lillian Blinder "would wire me or send me the money" from the Boston account. *Id.* at 36. Mathes provided Meyer Blinder with instructions for the wire transfer, and the call ended.

At the time the wire transfer was arranged, Mathes knew the Colorado action was a SIPA liquidation; knew a trustee had been appointed; and knew the trustee had filed an alter ego action against Blinder in Colorado. Trial Tr. (R.Vol. V) at pp. 28–30. Mathes knew summary judgment had entered against Blinder in the Alter Ego Action, *id.* at 33–34, and was familiar enough

1. Lillian Blinder ordered $550,000 transferred to her daughter Linda Blinder out of the State Street account and $400,000 out of the same account to the Blinder Trust, of which her son, Martin Blinder, and his wife Janet, were the trustees. *See* Letters from L. Blinder to State Street Bank dated 2/5/92 (R.Vol. II, Exs. 63 & 64); Order, Adv.Pro. No. 91–1283 RJB (April 21, 1992) (R.Vol. II, Tab 27) (detailing February transfers). The Trustee successfully challenged these transfers in an avoidance action filed on March 30, 1992 (the "Children's Trust Action"). I affirmed the judgment against Martin and Janet Blinder in a published opinion in 1994. *See Keller v. Blinder, et al.,* 162 B.R. 555 (D.Colo. 1994). Meyer Blinder also engaged in several dubious asset transfers during this period of time, including transfers of over $2.4 million from accounts in Europe and elsewhere. *See* Trial Tr. (R.Vol. V) at 96–97. Blinder either denied or claimed he "forgot" making these transfers, which precipitated a federal criminal investigation. *Id.*

2. Mathes testified he had been with Dilworth Paxson for 20 years, and had moved to HM & K on January 1, 1992. Trial Tr. at 17.

3. At trial, Mathes testified that Blinder had not paid his fees to the Dilworth Paxson firm and had been sued for the receivable. Trial Tr. at 24. He also testified that the firm Blinder retained after Dilworth, the Schnader Harrison firm, also withdrew its representation after Blinder failed to pay his fees. *Id.* at p. 25.

with the action to tell the Pennsylvania court its precise docket number.[4] *Id.* at 32. Nevertheless, Mathes arranged for and accepted the $75,000 transfer without inquiring as to its propriety and without attempting to contact the Trustee or the Colorado bankruptcy court.

On February 7, 1992, after a hearing on damages, the Pennsylvania court entered judgment against Meyer Blinder in the amount of $73,319,824.45 and against IEI in the amount of $70,111,812.55. The court imposed a constructive trust and an equitable lien on all assets in which Meyer Blinder had an interest, as well as a constructive trust and an equitable lien on all assets traceable to the $23 million defrauded from the plaintiffs, irrespective of who held those assets. HM & K, on behalf of Blinder and IEI, appealed the judgment to the United States Court of Appeals for the Third Circuit on February 14, 1992.

On February 27, 1992, the bankruptcy court granted the Trustee's motion in the Alter Ego Action for a temporary restraining order enjoining the Hoxworth Class from executing on the Hoxworth judgment. Minutes of Proceedings 2/27/92 (R.Vol. II, Ex. 24). On March 12, 1992, the bankruptcy court entered final judgment against Meyer Blinder, Lillian Blinder and IEI in the Alter Ego Action in the amount of $125,233,469.[5] Judgment (R.Vol. II, Ex. 9). The court reiterated that all property of the Blinders and IEI would be held in *custodia legis* and remain subject to the continuing jurisdiction of the bankruptcy court. *Id.*

On March 20, 1992, Mathes sent a telefacsimile to Trustee's counsel in Denver requesting the release of certain Blinder assets in order to defend Blinder in the Pennsylvania action. *See* Mathes–McNamara Letter (R.Vol. II, Ex. 50). Mathes did not mention the $75,000 retainer HM & K had received in February, but by then the retainer had nearly been exhausted. *See* Billing Statements for February and March 1992 (R.Vol. II,

Exs. 16 & 17). McNamara responded the same day by fax, declining to release any estate assets to pay for Blinder's legal defense, but informing Mathes that "the Trustee agreed, in February 1992, to permit Meyer Blinder to retain significant cash reserves in several bank accounts specifically to fund his legal defense." McNamara–Mathes Letter (*id.*, Ex. 51). In addition, McNamara stated that "funds for Meyer Blinder's legal defense may be available from third-party sources including Meyer Blinder's wealthy immediate family." *Id.*

On Friday, March 27, 1992, the Trustee learned for the first time about the Lillian Blinder Trust's Boston account and over $1 million in transfers that had been made from it in February 1992. Included in this amount were transfers totalling $950,000 to the Blinder children's accounts at the same Boston bank, as well as the $75,000 transfer to HM & K. Trial Tr. (R.Vol. V) at 162–63 (Keller testimony). Hoping to recover the $950,000 and to prevent further transfers to the Blinder children, the Trustee initiated the Children's Trust Action, Adv.Pro. No. 92–1388 RJB, against the Linda, Larry, Martin and Janet Blinder, the Blinder Trust, Lillian Blinder, and the Lillian Blinder Trust. (R.Vol. II, Ex. 13.) The Trustee obtained a temporary restraining order freezing the children's accounts that same day.

Also on March 30, 1992, the Trustee filed a motion in the Alter Ego Action to dissolve the February 4, 1992 stipulation and stay of execution. In a seven-page written order dated April 21, 1992, the bankruptcy court granted the motion, finding Meyer Blinder's assertion that he had "forgotten" about the account and "misunderstood" the January 10 stipulation and February 4 order approving it "totally unbelievable." Order (R.Vol. II, Ex. 10) at 5. The court found the Blinders had "fraudulently induced" the Trustee to enter into the stipulation by failing to disclose the account's existence, and lifted the

---

4. Mathes appeared on Blinder's behalf at the February 3, 1992 trial setting hearing, but failed to obtain a continuance.

5. The Blinders' liability as alter egos of Blinder Robinson was established by the bankruptcy

court in its January 10 judgment. The March 12 judgment was entered after a six day trial in which damages were determined with respect to the Blinders, and liability and damages were determined with respect to IEI.

stay as it applied to assets that had not been fully disclosed. *Id.* at 6–7. The court further ordered that the Blinders were

> restrained and enjoined from the transfer, sale, hypothecation, encumbering, conveying, or other disposition of any of their assets ... including without limitation assets in the Lillian Blinder Trust, save and except for approximately $60,000 now held by them in a local checking account.

*Id.* at 7.

On August 25, 1992, the Trustee, representing all creditors of the estate, entered into a settlement agreement with the Blinders (the "Blinder Settlement").[6] *See* Settlement Agreement (R.Vol. II, Ex. 15). The agreement required the Blinders to transfer all their assets into the Blinder Robinson estate with the exception of certain assets then valued at approximately $1.8 million (the "Excluded Assets"). *Id.,* ¶ 2 & Ex. B thereto. The Excluded Assets were to be held in the Lillian Blinder Trust and included specified shares of IBM stock. In a paragraph entitled "Miscellaneous," the parties specifically agreed to a $50,000 disbursement to HM & K to be "realized by a sale of the requisite shares of IBM." *Id.,* ¶ 15.[7]

The Trustee initiated the instant adversary proceeding against HM & K in February 1994. The Trustee advanced two causes of action: (1) unauthorized post-petition transfer under 11 U.S.C. §§ 549 and 550; and (2) turnover of property of the estate pursuant to 11 U.S.C. § 542. HM & K filed an answer and affirmative defenses, and the parties filed cross motions for summary judgment. The bankruptcy court denied both motions at a pretrial hearing held September 29, 1994.

The action was tried before Judge Cordova on October 24, 1994. At the close of the Trustee's case, HM & K moved to dismiss on grounds the Trustee had failed to prove that the $75,000 was property of the estate. *See*

Trial Tr. (R.Vol. V) at 180–83. After hearing argument from both sides, Judge Cordova elected to rule on the motion at the end of the case. *Id.* at 185.

On December 6, 1994, Judge Cordova issued a Memorandum Opinion and Order denying HM & K's motion to dismiss; declaring the $75,000 payment an unauthorized postpetition transfer under 11 U.S.C. §§ 549 and 550; finding the proceeds of the transfer to have been property of the estate; and requiring HM & K to turn the proceeds over to the Trustee under § 542. This appeal ensued.

## II.  *STANDARD OF REVIEW.*

■ On appeal, the district court may "affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings." Fed.R.Bank.P. 8013. Findings of fact, whether based on oral or documentary evidence, will not be disturbed unless "clearly erroneous." *Id.* "Due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses." *Id.* Conclusions of law are reviewed *de novo. Branding Iron Motel, Inc. v. Sandlian Equity, Inc. (In re Branding Iron Motel, Inc.),* 798 F.2d 396, 399–400 (10th Cir.1986).

■ On the mixed question of whether the facts satisfy the proper legal standard, the district court should conduct a *de novo* review if the question involves primarily the consideration of legal principles and apply the clearly erroneous standard if the question is primarily a factual inquiry. *Clark v. Security Pac. Business Credit, Inc. (In re Wes Dor, Inc.),* 996 F.2d 237, 241 (10th Cir. 1993).

*Hoxworth,* 170 B.R. at 441, *on appeal,* 74 F.3d at 207.

---

6. The settlement resolved the Alter Ego Action, Adv.Pro. No. 91–1283 RJB (which was then on appeal) and a turnover action action, Adv.Pro. No. 91–1429 SBB, filed by the Trustee in June 1991. On September 21, 1992, the Trustee and the Hoxworth plaintiffs reached a settlement on the Hoxworth plaintiffs' claims against the estate arising out of the judgments entered against Blinder and IEI in Pennsylvania. *Discussed in*

7. HM & K characterizes this provision as requiring the disbursement of an "additional" $50,000 in legal fees to HM & K. The word "additional" appears nowhere in the provision and HM & K's characterization is self-serving and entirely misleading.

## III. *MERITS.*

### A. *$75,000 as "Property" of the Bankruptcy Estate.*

■ HM & K's first argument is that the bankruptcy court erred when it found the $75,000 was the equitable property of Lillian Blinder. HM & K argues the Trustee failed to present any evidence regarding the beneficial ownership of the $75,000 and thus failed to meet his burden of establishing that it was "property of the estate" for the purposes of 11 U.S.C. §§ 549 and 550.

While it concedes Meyer and Lillian Blinder were beneficiaries of the Lillian Blinder Trust, *see* HM & K Opening Br. at 18–19, HM & K points out that third parties such as the Blinder grandchildren were also beneficiaries. The Trustee's failure to prove the $75,000 transferred had been held for the benefit of Meyer or Lillian Blinder rather than for those third parties, HM & K argues, required dismissal of his claims. *Id.* The argument is without legal or factual support.

HM & K cites no authority for the proposition that, where a debtor is not only the trustee but also one of several beneficiaries to a family trust and makes a transfer from it, the bankruptcy trustee must prove the proceeds of the transfer were held for the debtor's, rather than one of the other beneficiaries', benefit before they can be considered "property of the estate." Even if such authority existed, the undisputed facts made out a *prima facie* case that the $75,000 belonged to Lillian Blinder.[8]

HM & K presented no evidence to controvert the reasonable inference to be drawn from these facts and no evidence to suggest the funds belonged to a beneficiary other than Lillian Blinder. It simply speculated that, "[s]o far as the Trustee proved at trial,

HM & K could have received the grandchildren's money, or money being held in the Lillian Blinder Trust for some other person or organization." HM & K Opening Br. at 20. This surmise is insufficient to rebut the inference that assets, transferred from an account opened by Lillian Blinder, in her own name, as trustee for the Lillian Blinder Trust, belonged to Lillian Blinder and, by operation of the Alter Ego judgment, to the estate.[9]

Further, it is the law of this case that the January 10 Alter Ego judgment is preclusive on the issue of whether Lillian Blinder Trust assets are property of the Blinder Robinson estate, even as it applies to non-parties. In my decision affirming the bankruptcy court's entry of summary judgment in favor of the Trustee in the Children's Trust Action, I rejected Martin and Janet Blinder's argument that the Trustee had failed to prove the $400,000 in Lillian Blinder Trust assets transferred to them were property of the estate:

> First, although the Blinders repeatedly assert that the bankruptcy court did not actually determine that the assets of the Lillian Blinder Trust were property of the estate, a plain reading of the January 10 order and later rulings based upon that order shows this to be untrue. They clearly reflect the bankruptcy court's conclusion that assets held in the Lillian Blinder Trust were part of the property to be turned over to the Trustee in the Alter Ego Action.

162 B.R. at 560.

HM & K attempts to distance itself from the effect of the January 10 Alter Ego judgment by arguing first that the exemption in the January 2, 1992 TRO for transfers used

---

**8.** It is undisputed in this case that Meyer and Lillian Blinder were beneficiaries of the Lillian Blinder Trust; Lillian Blinder was the trustee; the specific State Street Bank trust account from which the $75,000 was transferred was in her name; and Lillian Blinder personally directed that the $75,000 transfer be made.

**9.** I note that after the briefing was complete in this appeal, Mathes, on behalf of HM & K, sent a letter addressed to me apprising me that the Tenth Circuit had issued its opinion in *Hoxworth*

*v. Blinder, et al.* and arguing that the opinion supported HM & K's argument on the property issue. The Trustee filed an immediate response to the letter, asserting it was an improper communication under D.C.COLO.LR 77.7 and taking issue with Mathes's characterization of the Tenth Circuit's opinion. Rather than strike the communication, I view it as a request to file supplemental authority. I consider both the letter and the response and find neither affects my conclusion that the $75,000 was property of the estate.

to pay "bills and obligations" incurred in the "ordinary course" of business applied to the $75,000 retainer, and second, that because the January 10 judgment was subject to a stay of execution as of February 3, 1992, the January 2 TRO was the "only order in force" on the date of the transfer. HM & K Op.Br. at 20. The argument is without merit.

As an initial matter, the January 2 TRO addressed the range of permissible and impermissible transfers of property; it neither defined what was or was not property of the estate nor somehow excluded from the definition of "property" funds used by the Blinders to pay legal fees.[10] Further, the TRO was, as its name suggests, "temporary." It was supplanted by the parties' January 10 stipulation in which the Trustee agreed to stay execution of the Alter Ego judgment in exchange for the Blinders' specific agreement to refrain from transferring funds over $2,000 from the Lillian Blinder Trust without prior approval of the court after notice to the Trustee. *See* Tr. and Minutes of 1/10/92 Hg. (R.Vol. II, Exs. 6 & 7).

Second, the January 10 stay merely prevented the Trustee from executing on the Alter Ego judgment. It did not alter the force or effect of the judgment itself, which constituted the law of the case. Thus, at the time the transfer to HM & K took place on February 3, 1992, the Lillian Blinder Trust had been declared "property of the estate" and HM & K's arguments to the contrary were properly rejected.

B. *HM & K's Affirmative Defenses.*

In addition to its assertion on appeal that the Trustee failed to prove his claims, HM & K also argues that the bankruptcy court erroneously rejected certain of its affirmative defenses. As set forth below, I disagree.

1. *11 U.S.C. § 550(a)(1)— "Initial Transferee."*

▮▮▮ Under Bankruptcy Code § 550, a trustee may recover postpetition transfers from the "initial transferee" or an "immedi-

ate or mediate transferee" of the initial transferee, *see* 11 U.S.C. § 550(a), but may not recover from an immediate or mediate transferee who takes "for value ... in good faith, and without knowledge of the avoidability of the transfer." 11 U.S.C. § 550(b)(1). At trial, HM & K argued that Lillian Blinder, or the Lillian Blinder Trust, was the "initial transferee" because it was Lillian Blinder who received the funds from the debtor, Blinder Robinson, and then transferred them to HM & K. As an "immediate or mediate transferee" of the initial transferee, HM & K maintained it was entitled to the protection of § 550(b)(1).

The bankruptcy court disagreed. It relied on my rejection in the Children's Trust Action of the argument forwarded by Martin and Janet Blinder that it was Boston Financial Data Services, not they, who was the "initial transferee" of the $400,000 Lillian Blinder Trust transfer to them. Mem.Op. and Order at 14 (citing *Keller,* 162 B.R. at 562). The bankruptcy court found HM & K "had not demonstrated that State Street Bank exercised any dominion or control over the funds," and concluded the Bank served as a "mere conduit to the real initial transferee, [HM & K]." *Id.*

HM & K asserts the bankruptcy court misapprehended its argument by focusing on State Street Bank rather than Lillian Blinder. HM & K concedes the Bank was not an "initial transferee," but argues Lillian Blinder was because unlike the Bank, she could control the funds in the Lillian Blinder Trust and put them to her own use. While this may be true, HM & K's argument ignores the fact that Lillian Blinder had already been found by the bankruptcy court to be Blinder Robinson's alter ego. Lillian Blinder could not be and "initial transferee" of Blinder Robinson property because she and Blinder Robinson were one and the same. HM & K's contrary assertion therefore fails as a matter of law.[11]

---

**10.** In the sentence prohibiting the Blinders "from transferring ... any real or personal property, in their possession, custody or control ... other than in satisfaction of bills and obligations ...," the phrase "other than" modifies the word

"transferring," not the definition of "real or personal property." *See* TRO (R.Vol. II, Ex. 4).

**11.** Because HM & K was an "initial," rather than an "immediate or mediate transferee of [an]

### 2. *The Blinder Settlement—Accord and Satisfaction under 11 U.S.C. § 550(d).*

■ Next, HM & K asserts the bankruptcy court erred in rejecting its defense under 11 U.S.C. § 550(c) (now § 550(d)).[12] HM & K asserts the instant action was barred under § 550(d) because any claim the Trustee may have had to the $75,000 retainer was satisfied when the Trustee entered into the August 25, 1992 Blinder Settlement and settled its claims against Lillian Blinder. The bankruptcy court disagreed, finding HM & K's status as a nonparty and the lack of any express agreement releasing HM & K dispositive of the issue. Mem.Op. and Order at 12.[13]

HM & K argues that because the Blinder Settlement resolved "all claims" brought by the Trustee against Lillian Blinder and the Lillian Blinder Trust, it was an accord and satisfaction of the Trustee's claim for the $75,000 retainer. HM & K Opening Br. at 35. HM & K's argument turns on the assertion that "[t]he Trustee had already made a claim against Lillian Blinder for the $75,000 payment and settled that claim in the August 25 agreement." *Id.* To support the assertion, HM & K relies on a specific allegation in the Trustee's Complaint in the Children's Trust Action that, among other things, "Lillian Blinder and the Lillian Blinder Trust transferred $75,000 from the Lillian Blinder Trust Account." Compl. (R.Vol. II, Ex. 13) at ¶ 24.

The issue, as it is presented on appeal, is one of semantics: The Trustee maintains the $75,000 transfer allegation was made as part of the pattern of conduct evidencing "complete disregard" of the Bankruptcy Court's orders; HM & K contends the allegation constituted a claim against Lillian Blinder for the $75,000. The bankruptcy court agreed with the Trustee, finding "no claim was made in the children's trust action for recovery of the $75,000." Mem.Op. and Order at 13. The finding was not erroneous.

The Trustee in the Children's Trust Complaint asserted eight claims for relief: Four claims against Linda Blinder, Larry Blinder, Lillian Blinder and the Lillian Blinder Trust for avoidance and turnover of transfers from the Lillian Blinder Trust to Linda and Larry Blinder; and four claims against Martin Blinder, Janet Blinder, the Blinder Trust, Lillian Blinder, and the Lillian Blinder Trust for the avoidance and turnover of transfers from the Lillian Blinder Trust to Martin and Janet Blinder and the Blinder Trust. Compl. (R.Vol. II, Ex. 13). There was no claim for the avoidance or turnover of the transfer to HM & K and no relief against HM & K was sought. In fact, there was no mention of HM & K anywhere in the Complaint.

The intent of the Blinder Settlement was to resolve all of the Trustee's pending or future claims against Meyer or Lillian Blinder, the Lillian Blinder Trust or Redmey (identified collectively as the "Defendants").

initial transferee," I do not address HM & K's § 550(b)(1) defense on appeal.

12. Section 550(d) provides that the trustee in bankruptcy "is entitled to only a single satisfaction" in avoidance actions brought under § 550(a).

13. I am puzzled by the parties' assumption, adopted by the bankruptcy court, that the August 25, 1992 Blinder Settlement was a settlement of the Children's Trust Action. The agreement, at most, is ambiguous on this issue. At paragraph C of the "Recitals" section, the parties state their intent to resolve "outstanding claims and differences among them in the Actions," and then define "Actions" as they are contemplated in the agreement as being limited to Adversary Proceeding No. 91–1283 RJB (the "Alter Ego Action") and 91–1429 SBB (a turnover action against Meyer and Lillian Blinder, IEI and Red-

mey Management Co., a dissolved corporation of which the Blinders were directors). *See* Blinder Settlement (R.Vol. II, Ex. 15). Paragraph 12 of the section entitled "Agreement," however, provides that "within 30 days after the completion of the transfers of all assets contemplated herein, counsel for the Trustee and Defendants shall execute ... stipulations of dismissal in all pending adversary cases related to the liquidation of ... Blinder Robinson in which any Defendant is a party." Because the Lillian Blinder Trust was a party to and identified in the agreement as a "Defendant," the agreement may be interpreted as a settlement of the Trustee's then existing claims against Lillian Blinder and the Lillian Blinder Trust in the Children's Trust Action. In any event, the distinction is immaterial because HM & K was not a party to either action and it was this status as a nonparty that drove the bankruptcy court's rejection of HM & K's § 550(d) defense.

The Settlement expressly reserved the Trustee's "right to file suit and to prosecute all pending suits against any person or entity other than the Defendants." Blinder Settlement (R.Vol. II, Ex. 15) at ¶ 4(b).

Because there is no basis in fact for HM & K's § 550(d) defense, the bankruptcy court's rejection of it is affirmed.

### 3. *Equitable Estoppel.*

█ HM & K's final argument is that the bankruptcy court erred in rejecting its defenses of equitable estoppel and laches. HM & K asserts the March 20 McNamara–Mathes Letter (R.Vol. 2, Ex. 51), together with the fact that the Trustee permitted HM & K to continue its representation of Blinder in the Hoxworth Class Action without questioning the $75,000 transfer, precluded the Trustee, as a matter of equity, from initiating the instant adversary proceeding two years later.

The bankruptcy court was initially sympathetic, denying the Trustee's motion for summary judgment on HM & K's equitable estoppel defense. *See* Tr. 9/29/94 Hg. on Mots. for Summ.J. (R.Vol. IV) at 17–19 (while finding the defense of laches "[didn't] hold any water," the court expressed concern over the Trustee's failure, during a series of communications with HM & K in the Spring of 1992, to state its intent to·pursue the $75,000). After hearing the parties' testimony at trial, however, the court reconsidered. It rejected both defenses, finding (1) the Trustee "never intended to release his claim for the $75,000 and never represented to [HM & K] that he did so intend"; (2) HM & K "ha[d] not shown the reasonableness of any reliance it may have had upon the Trustee's conduct"; and (3) any reliance by HM & K was, in fact, unreasonable given its knowledge of Blinder's history and the fact he was in liquidation proceedings, the existence of the Trustee, and the fact it was a sophisticated law firm. Mem.Op. & Order at 13–14. With respect to the defense of laches, the court found the Trustee had brought the instant action within the applicable statute of limitations under 11 U.S.C. § 549(d) and "provided a reasonable explanation as to why the filing of the action was delayed after the discovery of the transfer." *Id.* at 14. With the exception of the statute of limitations issue, which HM & K does not challenge on appeal, the court's findings are subject to the clearly erroneous standard of review.

HM & K contends the court's findings are clearly erroneous, and that the facts proved support the opposite conclusion. HM & K argues the March 20, 1992 letter from Trustee's counsel, stating that funds for Blinder's defense may be available from third-party sources "including Meyer Blinder's wealthy immediate family," created a "false impression" that the $75,000 transfer was proper. HM & K Opening Br. at 36–37. HM & K argues the Trustee's silence after learning the transfer had come from the Lillian Blinder Trust continued the false impression, and justified HM & K's reliance on it. The fact Mathes knew Blinder was in bankruptcy and that a Trustee was appointed should not, HM & K maintains, lead to the conclusion that it should have suspected a transfer from Blinder's wife was "thereby tainted." *Id.* at 37.

I reject the argument. The record supports the bankruptcy court's findings that the Trustee did not intend for his delay in pursuing the $75,000 to be construed as a waiver of his right to do so and that HM & K's contrary impression was unreasonable. Accordingly, I decline to disturb them on appeal.

### IV. *CONCLUSION.*

For the foregoing reasons, I AFFIRM the bankruptcy court's December 6, 1994 Memorandum Opinion and Order and AFFIRM the judgment against HM & K. The parties are to bear their own costs. This ruling disposes of all the issues raised in the appeal. Let judgment enter.